UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BARRY BLISS,                                    CASE NO. 2:20-cv-13404

       *Plaintiff*,                        HON. VICTORIA A. ROBERTS
*v.*                                            DISTRICT JUDGE

COMMISSIONER OF SOCIAL                          HON. PATRICIA T. MORRIS
SECURITY,                                       MAGISTRATE JUDGE

       *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 16, 17)

### I.    RECOMMENDATION

Plaintiff Barry Bliss challenges the Commissioner of Social Security regarding a final decision denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The case was referred to the undersigned for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3). For the reasons below, I recommend **GRANTING** Plaintiff's motion for summary judgment, (ECF No. 16), **DENYING** the Commissioner's motion, (ECF No. 17), and remanding the decision.

### II.    REPORT

#### A. Introduction and Procedural History

Plaintiff filed an application for a period of disability, DIB, and SSI on March 8, 2019, alleging that he became disabled on January 31, 2019. (ECF No. 13, PageID.291, 297.) Plaintiff was denied at the initial level and requested a hearing before an

1

administrative law judge ("ALJ").  (*Id*. at PageID.210, 219, 230.)  On March 18, 2020, The ALJ determined that Plaintiff was not disabled.  (*Id*. at PageID.71.)  Plaintiff appealed this decision, and the appeal was denied. (*Id*. at PageID.39.) Plaintiff then filed a complaint in this Court seeking relief, (ECF No. 1), and both parties filed motions for summary judgment. (ECF No. 16, 17.)

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 13, PageID.71.) At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since "January 31, 2019, the alleged onset date." (*Id*. at PageID.56.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: pervasive developmental disorder, intermittent explosive disorder, learning disability, attention deficit hyperactivity disorder, and borderline intellectual functioning. (*Id*.) The ALJ found that Plaintiff's "hypercholesterolemia, vitamin D deficiency, and

hypertension" were nonsevere impairments.  (*Id*.)  None of these impairments met or medically equaled a listed impairment at step three.  (*Id.* at PageID.57.)  Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: no exposure to obvious hazards. The claimant can also: understand, carry out, and remember simple instructions where the pace of productivity is not dictated by an external source over which he has no control such as an assembly line or conveyor belt; make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day to day with few and expected changes; and respond appropriately to occasional contact with supervisors, occasional contact with the general public, and no working in team or tandem with coworkers.

(*Id.* at PageID.60.)  At step four, the ALJ found that Plaintiff could perform some of his past relevant work, specifically, as a hand packager.  (*Id.* at PageID.69.)

Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy in addition to some of his past work, (*id.* at PageID.70), including work as housekeeping/cleaner, cafeteria attendant, and photocopy machine operator.  (*Id.* at PageID.70-71.)  Accordingly, the ALJ concluded that Plaintiff was not disabled.  (*Id.* at PageID.71.)

### E.  Administrative Record

#### i.     Plaintiff's Testimony at the Administrative Hearing

The ALJ began by noting "there's a prior decision from a few years ago in your case, so I'm bound by that unless there's new and material evidence. But I will be making a brand-new decision based on all the evidence which includes the record, which I've

reviewed as well as any testimony we take from you or any other witnesses today." (ECF No. 13, PageID.80.)

Counsel for Plaintiff opened by discussing the nature of Plaintiff's case. (*Id*. at PageID.82-83.) Counsel stated "[h]e was unrepresented at the prior hearing, didn't understand maybe the ramifications of not appealing." (*Id*. at PageID.82-83.) She explained that they believed the evidence would show Plaintiff has a "marked impairment with social interaction and the ability to manage and adapt himself." (*Id*. at PageID.83.)

The ALJ summarized the previous decision, (*id*. at PageID.84-85), then questioned Plaintiff. (*Id*. at PageID.85.)

Plaintiff testified that he lived in a duplex apartment, but it did not have a washing or drying machine, so his mother picked him up every Saturday to do laundry at her house. (*Id*. at PageID.85-86.) Plaintiff was forty-four years old at the time of the hearing. (*Id*. at PageID.86.) He was single and living by himself, and his parents paid his rent at the duplex apartment. (*Id*. at PageID.87.) He testified that he did not have a driver's license, although he tried to obtain one in the past. (*Id*. at PageID.88.) His mother usually drives him when he needs to travel. (*Id*.) He tried to use the bus system but it "gets complicated" for him. (*Id*. at PageID.89.) Plaintiff noted that the bus schedule changed, and he did not "do change well." (*Id*.) Plaintiff had a high school education and was in special education classes from second grade on. (*Id*.) He noted that he could read "simple stuff," but it was hard for him to "comprehend it." (*Id*.) He would have to "double check everything three or four times over" to understand or comprehend. (*Id*. at PageID.90.)

When asked if he could read or understand the newspaper, Plaintiff responded that he can "understand it, but if you ask me about it later [] I might not remember it." (*Id*.) He testified that he could write a note to his mom telling her, for instance, that he was not home. (*Id*.) Plaintiff testified that simple math, like adding and making change at the store, was "hard." (*Id*.)

Plaintiff confirmed that he was previously hired through a job placement agency, that performed an "assessment" on its candidates and "took them" to a place to work "for three or four weeks." (*Id*. at PageID.91.) It was through this placement program Plaintiff secured his prior job at Tractor Supply. (*Id*.) Plaintiff confirmed that he was not working at Tractor supply at the time of the hearing, though. (*Id*.) The placement program was continuing to look for jobs for Plaintiff, but several of his limitations made it difficult to find a placement; for instance, Plaintiff could not use a cash register or do simple math, and could not "go from the back of the store to the front of the store[,] [or] do anything in between." (*Id*. at PageID.92.)

The ALJ asked Plaintiff about his other past work. (*Id*. at PageID.93.) From 2013 through 2018, Plaintiff worked at McDonald's. (*Id*. at PageID.92-93.) There, Plaintiff "did maintenance" and occasionally cooked. (*Id*. at PageID.93.) His maintenance job consisted of washing windows, sweeping and mopping the floor, and cleaning bathrooms. (*Id*.) He would lift up to sixty or seventy pounds when he helped unload frozen food out of a truck (*Id*.)

After working for McDonald's, Plaintiff worked at a factory that made "car parts" for "Fords" through a "temp agency" called Manpower. (*Id*. at PageID.95.) In this position

he would "box" car parts as they came in from a truck. (*Id*. at PageID.95.) He then worked at another McDonald's following the factory. (*Id*. at PageId.95.)

The vocational expert ("VE") asked whether, when Plaintiff was working at fast food restaurants and sometimes worked as a cook, if he had to read the orders and "figure out" what to cook, or if someone told him what to cook. (*Id*. at PageID.96.) Plaintiff responded that he had to read the order from a computer monitor, but that he had a hard time understanding—he said he mostly did "cooking on the grill, like flipping the hamburgers." (*Id*. at PageID.97.)

Plaintiff described instances where he struggled with adapting to change at work. For instance, when there was a change in his coworkers, he testified, "I don't adapt to change very well. So the change was coming play. Like I would just start to learn something and then it would change and I would have nobody working with me. I'd be the only one on that line and we had a time to get these things done in." (*Id*. at PageID.104.) When that new coworker left abruptly, and Plaintiff got another new coworker, "it just kept snowballing." (*Id*.) Plaintiff testified that he was required to work closely with his coworker and he didn't "interact with people very well." (*Id*. at PageID.105.) Plaintiff stated that since his last employment, his anxiety has gotten worse. (*Id*. at PageID.106.) He took several medications for anxiety. (*Id*. at PageID.107-08.)

Plaintiff's job placement agency visited his home (so that he didn't have to find a ride) twice a week to help him look for jobs online. (*Id*. at PageID.110.) Plaintiff explained, "a lot of the jobs that they're looking for me are online and because of my, I don't want to call it a disability but it is . . . they're looking for jobs I could do, like I said, I can't do the

cash, you know handle money." (*Id.*) Plaintiff did not have a computer or internet access on his cellular phone, and the job placement staff would often take Plaintiff to an employer to "try and talk to somebody" or else "simply wait[] for somebody to contact [Plaintiff] by phone or contact [the agency] by computer." (*Id.*) Plaintiff stated that he does not do well with computers but could operate his phone "pretty well." (*Id.* at PageID.111.) He uses his phone to watch videos on YouTube but doesn't "look up websites . . . because it's hard for [him] to." (*Id.*) He likes to watch television shows on the Disney channel, "the teenage shows," because he didn't "understand the adult stuff." (*Id.* at PageID.112.) He also enjoyed doing jigsaw puzzles. (*Id.* at PageID.113.)

Plaintiff lived alone and stated that he often made "TV dinners," but also made porkchops, steak, spaghetti, and cheesecake "from scratch." (*Id.*) His mother took him grocery shopping on Saturdays. (*Id.* at PageID.114.) Sometimes they would go shopping for clothes or to a craft store for Plaintiff to pick up a craft to do. (*Id.* at PageID.115.)

Plaintiff testified that one of his main issues in a job was being able to focus or remember instructions—he explained that he would have to ask for instructions or clarification three or four times, and he believed that was part of the reason he was "let go" from McDonald's. (*Id.* at PageID.116-17.)

Plaintiff had a bank account that his mother was also an authorized user to, and he said he sometimes needed help paying bills; his mother or the staff at the bank would help him. (*Id.* at PageID.119.) Plaintiff stated that he was responsible for paying his water, electric, and gas bills, and his parents paid his rent and helped him with groceries. (*Id.* at PageID.120.) Plaintiff attended church with his brother "every other Sunday" and

Michigan University football games with his father. (*Id*. at PageID.121-22.) When asked if he was ever fired from a job, Plaintiff said that he was fired from McDonald's for not being productive enough. (*Id*. at PageID.123.) Plaintiff explained that he didn't understand that reasoning, because in his mind, they just didn't want to "deal" with him. (*Id*. at PageID.123-24.)

Plaintiff described how his medication helped with his "explosiveness." (*Id*. at PageID.131.) He explained that even with his medication, he still had episodes of "explosiveness." (*Id*.) This would occur when someone was "pushing" him, and he would "yell and scream" because he was "pushed" "over [his] limit." (*Id*. at PageID.131-32.)

Plaintiff's father, David Bliss, testified. (*Id*. at PageID.133-34.) Bliss testified that he helped Plaintiff "navigate" for many years, and that Plaintiff had issues "getting through his daily chores" and working full time due to his difficulty following instructions. (*Id*. at PageID.134.) Regarding Plaintiff's prior employment at McDonald's, Bliss testified that Plaintiff's limitations "created a problem with the people he worked for" because "they would give him assignments that he wasn't capable of handling and the frustration would get to the point where he would maybe lose control a little bit." (*Id*. at PageID.135.) Bliss described that at Michigan University football game tailgates, Plaintiff would keep his head down and have trouble acknowledging new people who weren't in his family, although Bliss encouraged him to do so. (*Id*. at PageID.136-37.) Bliss stated that Plaintiff interacts better with people whom he sees "on a regular basis," such as his family members. (*Id*. at PageID.137.) In general Plaintiff had trouble relating to people who were his age, and he was unlikely to initiate contact with others. (*Id*. at PageID.137-38.) Bliss described a

10

situation where Plaintiff once tried to travel to Florida with his stepsister, and his suitcase was stolen. (*Id*. at PageID.140.) When asked if he felt that Plaintiff was vulnerable, Bliss responded, "very." (*Id*.) Bliss explained, "if you told [Plaintiff] to give you money for something, you could convince him without any problem. And the other problem is he doesn't understand money. So he wouldn't know what he was giving you." (*Id*. at PageID.140-41.) Bliss explained that he was happy Plaintiff was living successfully on his own, but then he "found out and realized in talking more to [Plaintiff's mother] that it's because she's monitoring everything." (*Id*.) This included "the bills, everything, a calendar on the wall where they write his schedule down, his pills she set up for him on his phone so he knows when to take them." (*Id*.)

Bliss explained an instance where he went with Plaintiff to help him look for a job. He took Plaintiff to a motel to apply for a maintenance or cleaning position. When asked if Plaintiff completed the job application, Bliss explained, "it was a regular old style employee application. . . . I was going to let him do it totally. And so I sat there and besides his name, [] that was it. [] Then I had to say, [] there's a place for your middle initial, [] and the date, [] that's how it was." (*Id*. at PageID.142.)

In Bliss's opinion, Plaintiff's anxiety had gone "downhill" from the previous January. (*Id*. at PageID.145.) Bliss attributed this to Plaintiff's work at the factory, and then losing his job at the factory. (*Id*. at PageID.146.)

### ii.    The Vocational Expert's Testimony at the Administrative Hearing

After Plaintiff and Plaintiff's father testified, the ALJ then questioned the vocational expert ("VE").  (*Id.* at PageID.149.) First, the VE identified Plaintiff's past work as the following: kitchen helper, Dictionary of Occupational Title ("DOT") code 318.687-010, heavy work performed at medium level, unskilled, SVP 2; cook helper, DOT code 317.687-010, heavy work performed at medium level, unskilled, SVP 2; hand packager, DOT code 920.587-018, medium work performed at medium level, unskilled, SVP 2. (*Id.* at PageID.151-52.) The ALJ noted that in the first hypothetical individual for the VE to consider, he was making one small change from the RFC in the prior decision. (*Id.* at PageID.152.) The following is the prior decision's RFC to which the ALJ referred:

> The claimant had the [RFC] to work at all exertional levels but with the following non-exertional limitations. No exposure to obviously [sic] hazards, and can understand, carry out, and remember simple instruction where the pace of productivity not dictated [sic] by an external source over which he has no control such as an assembly line or conveyor belt. Make judgements on simple work, respond appropriately to usual work situations and changes in a routine work setting that are repetitive from day to day with few unexpected changes and respond appropriately to occasional contact with supervisors, occasional contact with the general public and no working in team or tandem with coworkers.

(*Id.* at PageID.84-85.) the ALJ asked the VE to consider a hypothetical person with the above referenced RFC, but who could work in teams or perform tandem work. (*Id.* at PageID.152-53.) The VE responded that such an individual could perform Plaintiff's past work as a kitchen helper and hand packager, but not cook helper. (*Id.* at PageID.153.) The ALJ asked about an individual who could not work in teams or perform tandem work, as

in the original RFC. (*Id*.) The VE responded that such an individual could perform the hand packager position. (*Id*.) In addition, some other work that such an individual could perform included housekeeping cleaner, DOT code 323.687-014, light work, unskilled, SVP 2, although the VE noted that this position would include eliminating the jobs under this category in which the individual would be in a household "where there would be more than occasional contact." (*Id*. at PageID.153-54.) The VE continued, "where they would be more than [sic] occasional tandem activities," such an individual could perform "office type cleaning." (*Id*. at PageID.154.) There would be approximately 83,000 of these jobs available. (*Id*.) In addition, such an individual could perform the job of cafeteria assistance, DOT code 311.677-014, light work, unskilled, SVP 2, approximately 51,000 jobs available. (*Id*.) The VE noted that if "superficial" contact with the public was prohibited, this job would be eliminated. (*Id*.) Finally, the VE testified that such an individual could perform the job of photocopying machine operator, DOT code 207.685-014, light work, unskilled, SVP 2, approximately 31,000 jobs available. (*Id*.)

The ALJ asked the VE whether these positions would be available if the individual was off task more than fifteen percent of the workday. (*Id*. at PageID.154-55.) The VE responded that the jobs would not be available under those circumstances. (*Id*. at PageID.155.) The ALJ asked about job availability if the individual required frequent supervision after thirty days of learning the job. (*Id*.) The ALJ responded that such a requirement would preclude an individual from work. (*Id*.) The VE also explained that any absenteeism in excess of one day per month would be job prohibitive. (*Id*. at PageID.155-56.)

Finally, the VE confirmed that his testimony was consistent with the DOT but noted that the DOT did not address factors including being off task, absenteeism, or the length of breaks. (*Id*. at PageID.156.) The VE's analysis on those factors were based on his experience, collaboration with colleagues, and review of current labor market trends. (*Id*.)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

(2)    Licensed Psychologist, which includes:

   (i)    A licensed or certified psychologist at the independent practice level; or

   (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)    Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)    Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

14

(5)   Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)   Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)   Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)   Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

15

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)   Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his

17

or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a

medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c).  The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your

statements (symptoms)."  *Id.*  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated."  *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests."  *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]"  *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when

considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or

nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]"  *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

> (i)     [D]aily activities;
>
> (ii)    The location, duration, frequency, and intensity of . . . pain;
>
> (iii)   Precipitating and aggravating factors;
>
> (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)     Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work."  *Id.* § 404.1530(a).  Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits."  *Id.* § 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

23

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

## G. Arguments and Analysis

Plaintiff argues that the ALJ (1) improperly relied on the previous ALJ's decision, and (2) improperly relied on the outdated mental impairment listings at step three.

### a.  ALJ's Reliance on Prior Opinion

#### i.  Arguments

Plaintiff argues that "[r]ather than conduct a de novo review of Plaintiff's claims, the ALJ improperly applied res judicata principles despite new evidence presented and a change in law since the prior ALJ's decision." (ECF No. 16, PageID.763.) Specifically, Plaintiff argues that he submitted new evidence concerning his impairments during the five-year period after the first ALJ's decision, and that it was legal error for the present ALJ to apply collateral estoppel to certain findings rather than conduct a fresh review of Plaintiff's functional limitations. (*Id*. at PageID.775.)

In response, Defendant argues that while the present ALJ "followed many of the findings from the prior decision, he did so only after considering the evidence in the current

record." (ECF No. 17, PageID.788.) Specifically, Defendant argues that the ALJ analyzed the current the record in his decision, and even if the ALJ mistakenly believed he was bound by the prior decision, "this Court has found on multiple occasions that so long as the ALJ engages in a fresh review of the current evidence, it will affirm the decision even if the ALJ incorrectly states he or she was bound by the prior decision." (*Id*. at PageID.794) (collecting cases).

### ii.   Relevant Law

In *Dennard v. Sec'y of HHS*, 907 F.2d 598 (6th Cir. 1990), the Sixth Circuit held that an ALJ was "precluded by estoppel" from reconsidering whether a claimant could perform his past relevant work after another ALJ, deciding an earlier application, determined that the claimant could perform his past relevant work.   907 F.2d at 600. Subsequently, the Social Security Administration promulgated SSAR 98-3(6) which interpreted *Dennard* and instructed ALJs that they "must adopt" findings from earlier decisions, "unless there is new and material evidence relating" to the prior ALJ's finding. SSAR 98-3(6), 1998 WL 28390, at *3.  The ruling applied even where a new application alleged disability during a timeframe that succeeded the earlier application.  *See id.*

After *Dennard*, the Sixth Circuit decided *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), which, relying partially on the Court's holding in *Dennard*, explicitly held that where an ALJ makes a final determination concerning a claimant's entitlement to benefits, all of the ALJ's *findings* are binding on the parties in all subsequent applications absent evidence of a "changed condition." 126 F.3d at 842.  The *Drummond*

Court reasoned that "principles of res judicata" prevent ALJs from challenging earlier findings, absent changed circumstances. *Id.* at 841–42.[1]  In several unpublished decisions following *Drummond*, the Sixth Circuit applied this rule even where the new application concerned periods of time that were not addressed by the Administration's prior decision. *See, e.g.*, *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015); *Haun v. Comm'r of Soc. Sec.*, 107 F. App'x 462, 464 (6th Cir. 2004).

However, in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018), the Sixth Circuit significantly restricted the scope of *Drummond* and *Dennard*.  The Sixth Circuit explained that the *Drummond* Court "overstate[d]" how res judicata applied to subsequent applications.  *Earley*, 893 F.3d at 933.  The *Earley* Court held that while the *Drummond* Court was correct that "res judicata may apply to administrative proceedings," res judicata only prevented subsequent applications "for the same period of time," that was considered in the prior application.  *Id.*  Thus, ALJ's are not bound by prior findings when considering periods of disability that succeed the time period adjudicated in the earlier decision.  *Id.* Indeed, because "human health is rarely static" an "earlier proceeding . . . could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date."  *Id.*  Thus, ALJ's must "giv[e] a fresh look" to periods of disability that were not addressed in the prior ALJ's decision.  *Id.* at 931, 934.  Still, an ALJ at a later hearing need not "ignore" a prior ALJ's findings—"[a] later [ALJ] may" at least "consider what an

---

[1] The Social Security Administration promulgated SSAR 98-4(6), interpreting *Drummond*, on the same day that it promulgated SSAR 98-3(6).  The instructions in SSAR 98-4(6) are identical to those in SSAR 98-3(6).

earlier ALJ did . . . ."  *Id.* at 934.  An applicant whose "second filing mimics the first one" should "not have high expectations about success."  *Id.* at 933.

### iii.  The Present ALJ's Decision

Here, the ALJ began his opinion by noting that "[b]ased on a review of the current evidence, the findings herein are consistent with the current record, while accounting for the findings in the prior decision[.]" (ECF No. 14, PageID.54.) Regarding finding whether Plaintiff had severe impairments, the ALJ wrote that he "follows the findings of the prior [ALJ] decision as to the severe impairments[.]" (*Id*. at PageID.56.)

In considering whether Plaintiff had a severe impairment that met or medically equaled a listing, the ALJ evaluated the necessary elements for  listings 12.05, .08, and .11, and specifically analyzed evidence from the current record, including Plaintiff's testimony, his submitted function report, medical records from Monroe County CMH Center dated from January 4, 2018 through March 27, 2019, progress notes from Monroe County Community Health Authority dated from April 16, 2019 through July 1, 2019, and progress notes from Monroe County CMH dated from August 12, 2019 through September 19, 2019, and also dated from November 22, 2019 through January 6, 2020. (ECF No. 13, PageID.58.) Of these recent medical records, the ALJ made note that they showed Plaintiff didn't need reminders to take care of personal needs; his condition affects his ability to remember things and follow instructions; and he had impaired short-term memory/immediate recall. (*Id*.) The ALJ made similar findings and references to the current record throughout the analysis of whether Plaintiff's mental impairment met or medically equaled a listing. (*Id*. at PageID.58-59.)

Then, the ALJ determined Plaintiff's RFC. (*Id*. at PageID.60.) It is true that the present RFC is exactly the same as the RFC adopted by the prior ALJ in 2014. (ECF No. 13, PageID.60, 168 (prior decision.)) In making this determination, the ALJ noted that "[t]he current evidence of record remains consistent with the [RFC] set forth in the prior decision, even in light of the new mental function criteria analysis." (*Id*. at PageID.61.)

The ALJ considered the following evidence in his written opinion: Plaintiff's disability report, dated March 8, 2019; a list of medications from Plaintiff dated November 19, 2019; a function report from Plaintiff's father, dated March 23, 2019; Plaintiff's hearing testimony; a function report from Plaintiff's mother, dated December 10, 2019; medical records from the Monroe County Department of Health & Human Services, dated March 6, 2019; progress notes from Monroe County CMH dated January 4, 2018 through March 27, 2019; progress notes from the Monroe County Community Mental Health Authority, dated April 16, 2019 through July 1, 2019; progress notes from Monroe County CMH, dated August 12, 2019 through September 16, 2019 and again from October 8, 2019 through November 1, 2019; progress notes from Monroe County CMH, dated November 22, 2019 through January 6, 2020; progress notes from one Dr. Dennis Kulpa, Ph.D., dated August 20, 2019 through November 25, 2019, and progress notes from Dr. Kulpa dated December 11, 2019 through January 21, 2020; and office treatment records from one Dr. Arun Gupta, dated June 6, 2019 through November 1, 2019. (*Id*. at PageID.61-66.) Then, the ALJ cited the following evidence of record: psychological testing at the Ann Arbor Center for Family, dated July 8, 2019 through July 19, 2019, and again cited to several of the aforementioned medical records. (*Id.* at PageID.66-68.) The ALJ also noted that he

"fully considered" the opinion of the state agency medical consultants, dated April 11, 2019. (*Id*. at PageID.68.)

It is clear from his opinion that the ALJ considered Plaintiff's RFC after January 31, 2019, Plaintiff's new alleged onset date.  However, what must be determined is whether the ALJ conducted this analysis under the guidelines of *Earley*, or under the stricter standard of *Drummond*, which would be legal error and an unnecessarily high, and outdated, standard for Plaintiff to be required to meet.

Defendant cites several cases to support the proposition that even if the ALJ applied the wrong standard, and believed he was bound by the *Drummond* standard, this error was harmless because the ALJ did actually give the evidence a fresh look under *Earley*. First, Defendant cites *Sandersfield v. Comm'r of Soc. Sec*., No. 20-10740, 2021 WL 3417923, at *4 (E.D. Mich. Aug. 5, 2021). There, the Court reasoned that the "misunderstanding" of the ALJ's application of *Drummond* "does not require remanding the case, because application of that stricter standard favored the plaintiff: instead of giving the earlier determination respectful consideration, ALJ Nguyen believed that he needed new evidence to unbind him from ALJ Chess's determination." *Id*. at *4.

Defendant also cites to *Balknight v. Comm'r of Soc. Sec*., No. 18-11843-PTM, 2019 WL 4011881, at *14 (E.D. Mich. July 31, 2019), adopted 2019 WL 3997146 (E.D. Mich. Aug. 23, 2019). There, although the ALJ improperly followed *Drummond*, the ALJ ultimately held that "independent of *Drummond*, I would not have assigned a more restrictive residual functional capacity based upon the evidence currently before me, and for the reasons stated, may have assigned a less restrictive residual functional capacity."

*Id*. at \*14. This was a critical factor in the Court's decision that the ALJ actually followed the rule set forth in *Earley* and gave the record a "fresh look," even while mistakenly citing to *Drummond*. Indeed, the ALJ wrote that he was essentially doing just that; this Court held, "I conclude that the ALJ provided the necessary fresh look. For one thing, he expressly noted that absent res judicata he would have reached the same basic result." *Id*. In addition, as in *Sandersfield*, to the extent that the ALJ felt bound by the prior findings, the Court in *Balknight* also found that such a finding was actually to the plaintiff's benefit. *Id*.

And consider *Civitarese v. Comm'r of Soc. Sec*., No. 1:19-cv-2015, 2020 WL 4366077, at \*14 (N.D. Ohio July 30, 2020), also cited by Defendant. While Defendant cites to this case for the proposition that "the ALJ got to the correct end point required by the *Drummond-Earley* line of cases[,]" (*id*.), this opinion also states "the record does not show that the ALJ improperly applied *Drummond* by concluding that the prior RFC finding had issue-preclusive effect. Notably, the ALJ never indicated that the prior RFC finding was binding, or that he was 'required to' or 'must' adopt it. [] Instead, the ALJ merely stated that he adopted the prior RFC finding because the new evidence in the record did not show a change in Civitarese's condition." *Id*. at \*13.

Here, regarding the prior decision, the present ALJ wrote the following:

On September 5, 2014, Administrative Law Judge Melissa Warner issued a decision finding that the claimant was not disabled. (B1A). Pursuant to Acquiescence Rulings (AR) 98-3(6) and 98-4(6), absent new and material evidence documenting a significant change in the claimant's condition, or a change in the regulatory threshold, the residual functional capacity and certain other findings established in a prior hearing decision by an Administrative Law Judge must be considered by the present adjudicator,

30

provided that the new claim arises under the same title of the Act. Based on a review of the current evidence, the findings herein are consistent with the current record, while accounting for the findings in the prior decision, as discussed in more detail below.

(ECF No. 13, PageID.53-54.) The present ALJ also referred to the prior ALJ's RFC, writing, "The current evidence of record remains consistent with the residual functional capacity set forth in the prior decision, even in light of the new mental function criteria analysis." (*Id*. at PageID.61.) The ALJ also wrote, "In accordance with Acquiescence Ruling 98-3(6), the prior Administrative Law Judge findings concerning the claimant's past relevant work are followed absent evidence of new and material evidence of a change in conditions since the prior hearing." (*Id*. at PageID.69.)  The present ALJ's analysis differs in a few significant ways from those of the cases cited above, where although the ALJs improperly cited *Drummond*, they're opinions were still upheld as they followed *Earley*.

For instance, here, one difference as compared to *Sandersfield* is that while the present ALJ also appeared to believe that he needed new and material evidence to unbind him from the prior decision, such a mistake did not favor in this situation like it did in *Sandersfield*. This situation also arose in *Balknight*. But here, such an error would not have benefitted Plaintiff.

Secondly, and perhaps more importantly, it is not completely clear that the ALJ would have held the same had he not been bound by the "new and material evidence" standard. In *Balknight*, the Court found that absent res judicata, the ALJ would have found essentially the same result. In *Civitarese*, the Court found that the

31

ALJ "never indicated that the prior RFC finding was binding, or that he was 'required to' or 'must' adopt it." But here, the ALJ used the following language: "absent new and material evidence documenting a significant change in the claimant's condition, or a change in the regulatory threshold, the residual functional capacity and certain other findings established in a prior hearing decision by an Administrative Law Judge *must* be considered by the present adjudicator[.]" (ECF No. 13, PageID.53-54) (emphasis added). The use of the word "must" in relation to the consideration of prior findings indicates that the review of the evidence may not have been a "fresh look," as required by *Earley*. *Eearly*, 893 F.3d at 931. For these reasons, I suggest remanding the case for clarification on the standard used by the ALJ and to ensure that the ALJ analyzes the evidence under the *Earley* standard.

### iv.  Mental Impairment Listings

Although I recommend granting Plaintiff's motion in light of the *Drummond-Earley* issue, I analyze the following issue raised as well for thoroughness.

Plaintiff argues that the ALJ erred by analyzing an outdated version of the mental impairment listings found at 20 CFR Part 404, Subpart P, Appendix 1. (ECF No. 16, PageID.775.) Plaintiff argues that these regulations were revised in 2017, and that as the ALJ adopted the decision of the prior ALJ, which occurred before 2017, the present ALJ did not consider the new regulations. (*Id*. at PageID.777, 782.)

Defendant counters that the ALJ did not, however, adopt the prior ALJ's step three analysis. (*Id*. at PageID.796.) Defendant points out that while the prior ALJ considered

listings 12.05 and 12.08, (ECF No. 13, PageID.166), the current ALJ analyzed listings 12.05, 12.08 and 12.11. (*Id.* at PageID.57.)

Indeed, in the present opinion, the current ALJ analyzed the paragraph B criteria listed in the new version of the regulation, including the elements of understanding, remembering, or applying information, interaction with others, concentration, persistence, and pace, and adapting and managing oneself. (ECF No. 13, PageID.57-58.) And the ALJ based this decision on the evidence in the present record as outlined above. (See ECF No 13, PageID.57-60.)

Thus, I recommend that while the ALJ ultimately did not change the outcome from the prior decision, he did indeed apply the updated and proper regulations at step three.

### Conclusion

For the previously discussed reasons, I recommend **GRANTING** Plaintiff's motion, (ECF No. 16), **DENYING** Defendant's motion, (ECF No. 17), and remanding the decision.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States*

*v. Walters*, 638 F.2d 947 (6th Cir. 1981).   The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.   *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.   Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.   Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.   Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).   The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.   If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 25, 2022                              S/ PATRICIA T. MORRIS
                                                    Patricia T. Morris
                                                    United States Magistrate Judge